Good morning, your honors. Todd Burns on behalf of Mr. Kuok. I'd like to begin by talking about the preclusion of the duress defense. And I want to start with a few sort of broad few remarks and then focus in on the government's two arguments in that context. The government begins its reply brief discussing the duress issue by saying, duress is a defense that should be rarely allowed, should be precluded to prevent abuse. And then the government launches into its discussion. Its discussion is heavily based on a Ninth Circuit case called Vasquez-Landever. I think if you look at the facts of Vasquez-Landever and contrast them with the facts of this case, it's a good contrast to the case where Vasquez-Landever, the duress defense, was appropriately precluded, as compared to this case in which it was erroneously precluded. Vasquez-Landever was an illegal entry case. It was an illegal entry case. This was a man who eight times previously had been deported and had come back to the United States illegally. He alleged that in his home country of El Salvador, he was being extorted by a police officer, apparently turned the police officer in. The police officer was convicted and then died in prison while serving a sentence for that extortion of Mr. Vasquez-Landever. He then says that the police officer's friends continued, family continued to threaten him. No specific threat is alleged. There is certainly no threat that they threatened him that you've got to leave El Salvador, and there definitely was no threat that they threatened him that you have to go into the United States illegally. Nevertheless, Mr. Vasquez-Landever left El Salvador. He traveled through Guatemala. He apparently had a border crossing card to go into Guatemala. He traveled through Mexico. This took about a month and a half, these travels, and he spent about a week around the border, looking for a smuggler to take him across the border. Then he entered the United States illegally, where he was caught by border patrol based on the group that he was with tripping a seismic device. There were no specific threats involved, certainly no threats of violence or serious injury or threats against his family, and there was certainly no reason he had to enter the United States, even if there had been specific threats. He was safe in Mexico. He was safe in Guatemala. He may well have been safe somewhere in El Salvador. The facts in this case are very different. Mr. Kwok was a lifelong resident of Macau. For 32 years of his life, Macau was a Portuguese colony. Effectively, it had all of the sorts of freedoms and liberties that we take for granted here. In 1999, that changed. China took over Macau, and within a couple of years, Mr. Kwok was being pressured, coerced, threatened to do things that at first to him were very strange. Buying stuff off the Internet that was a box, the first thing was a box that cost $75. He didn't really know what was going on. He thought he was just being extorted, effectively, because he was an easy target and he had some contacts that would allow him to get communications type equipment. It didn't take long before the people that were threatening him made clear that they were with Chinese intelligence and that if he didn't go along with what they were asking him to do, that his wife and his child, eventually, after his child was born, would be kidnapped. Now, that's a very different circumstance from Vasquez-Landover. The government relies heavily on Vasquez-Landover, including taking out-of-circuit cases that are cited in that case. Are there other cases in which we have considered the position of family members who remain behind as part of the duress? Yes. Otis is the most obvious one. In that case, the defendant was engaged in money laundering in the United States. He was money laundering for a Colombian cartel. His father was back in Colombia and had previously been kidnapped by the cartel, and there was a threat that- Were they holding him at the time that he was committing these things? There is no indication of that. As a matter of fact, Otis makes clear that the threat is that- The defendant's name is actually Mansal, but there was more than one defendant- that the threat was that his father would be kidnapped again. So- Does Mr. Kwok have to show that he had no opportunity to get his wife and son out of Macau? Well, he certainly doesn't, to get that issue to a jury. He has to show that there was not a reasonable opportunity to escape. And the Ninth Circuit's case of Contento Pachon speaks exactly to this situation. Because the government, you know, in one of its two arguments, one is that, well, he didn't show there was no reasonable opportunity to escape. Really, the question is whether or not a rational jury could conclude that there was no reasonable opportunity to escape. And they said that he didn't make that showing because Mr. Kwok could have contacted law enforcement in the United States. Well, contacting law enforcement in the United States for someone who's being threatened by some criminal element in the United States may well be a reasonable opportunity to escape, because law enforcement obviously intercedes and can protect you. If you're in Macau, an island right there, controlled by China, and you are being threatened by the Chinese government, contacting law enforcement in the United States really does nothing for you. Now, incidentally, Mr. Kwok did make attempts to reach out to these people and say, look, I believe you are U.S. law enforcement agents. I want to cooperate with you. Please just indicate that you are, and let's see if we can work something out. And they just ignored him. But essentially, the government's argument here has to be not that Mr. Kwok could reach out to U.S. law enforcement, because that does nothing for him. He has to get out of Macau. Counsel, it looks to me that part of this was Judge Benitez's understandable irritation at the fact that this, that the arrest defense seemed to be raised at the last minute with a request to the government that clearly was going to require a continuance in the trial. Now, he doesn't base his decision on that, but did you have to give notice that you were going to raise this defense, and were you obligated to bring your Brady request before you got to the eve of trial, when you all of a sudden sprang it on both the government and the district court? Well, I don't believe I had to give notice, and I think the Supreme Court's Dixie case is clear on that. The contrast, as a matter of fact, the arrest defense. That might have been easy if you were supplying your own evidence, but where you were asking the government for Brady evidence, which they were likely going to have to go to the State Department, there isn't anything that happens quickly at the State Department. So this was clearly going to require a continuance on the eve of trial. Well, and I think that Judge Benitez could say, look, your request, this is a specific Brady request. It's too late to deny it, and incidentally, I did have some of that sort of evidence already in hand. I had a report from the State Department and a report from the Congressional Commission that corroborate that this sort of coercion of business people in Mr. Kwok's situation goes on, and it corroborates that the Chinese government, of course, which is common sense, uses oppression against its citizens and manages to control about over a billion people. So your answer is if that was the district court's concern, it could have denied the Brady request, but allows you to go forward with certain arrests required. Certainly. And coming back to the question about the reasonableness of the opportunity to escape, it really is the argument here is Mr. Kwok would have had to fled. He would have had to flee China. He would have had to flee with his family, hope he could get out. Where is he going to go? Will he be safe there? I mean, we've seen recently, apparently, the Iranian government will try and arrange to have a Saudi ambassador killed on the streets of New York. It's not unreasonable, or a jury should consider whether it's unreasonable, if he, Mr. Kwok, wouldn't know where to go. But first of all, he's got to get out. And Contento-Pachon speaks to exactly this situation. It says, to flee, Contento-Pachon, along with his wife and 3-year-old child, would have been forced to pack his possessions, leave his job, and travel to a place beyond the reaches of the drug traffickers. The juror might find that this was not a reasonable avenue of escape. Thus, this was a tribal issue. These are drug traffickers. Mr. Kwok is speaking of the Chinese government, a government that is established in the State Department report that I intended to introduce, you know, uses oppression on a widespread basis and quite effectively. I think the contrast between the two situations is stark. And if Contento-Pachon was allowed to present a duress defense, surely Mr. Kwok should be allowed to present it. The other, and so that's one of the government's major arguments, the reasonable opportunity to escape. The other one is, well, is this a legitimate threat? Basically, was it immediate? And they say, well, the immediate threat requirement indicates that there has to be monitoring of the person all the time. Basically, someone who's making the threat has to follow the person around all the time. Well, that certainly isn't what this court's case law has held. But incidentally, Mr. Kwok did proffer that his wife was being monitored, that he would, his wife and child, that he would repeatedly be shown reports indicating that she was being monitored. So as far as he knew, she was being monitored all the time. And, you know, geez, the Chinese government, again, if you look at the State Department report, just use your common sense, they don't know who's monitoring them. They don't know who's watching them. They don't know who's going to pick up his family. They don't know if they make a run for the border, if they can get through the border checkpoint. So even if monitoring were required, it's established here. But it's not required. If you look at the Otis case, which I mentioned before, they said, look, it's immediate or impending. And in that case, it was that there would be a second kidnapping. It's not that someone was following the defendant's father around in Colombia saying, you know, the moment you don't do something, we're going to shoot your father or kidnapping him. It's that they would go get him. The Contento Pichon, which I've also mentioned, you know, the government says in that case, well, the defendant was monitored on the plane. He swallowed some balloons of cocaine and supposedly was being monitored, watched by someone on the plane. But there's a whole period of time before that, of weeks, where the defendant is initially being offered this job and threatened to do it where there's no indication of monitoring whatsoever. And it's obvious there's no indication of monitoring because the court says, look, his option in that situation was to flee. That's the quote I just read. They said he could have fled, and the jury would have to decide if that's reasonable. Obviously, if someone's following him around with a gun all the time, there would be no option to flee. And it wouldn't be a question of a reasonable option. Again, there are numerous other Ninth Circuit cases. Solano is a Hells Angels leader who has threatened this person. The Hells Angels leader is dead, and the court still says, well, this is a reasonable threat that this person could be concerned of. And really what they're relying on is the Hells Angels organization is an organization with some history and some structure that could make good on an outstanding threat. I submit that the Chinese government fits that bill to a much greater degree than the Hells Angels. And, again, the defendant in that case is in the United States, where he arguably could have sought some help from law enforcement. The defendant, Mr. Kwok, certainly could not have. A couple other cases, Daquino, which I've cited in my brief, Navarro, similarly situations where there's no indication of constant, consistent monitoring. So to take the government's argument would really effectively require overruling a number of this Court's cases. And I believe I've already spoken to the reasonable opportunity to escape. So if the Court doesn't have any other questions under arrest, I'll switch gears to a couple of the other issues with respect to the substantive counts. The three substantive counts all charged the same action as the criminal conduct, which was an April 2009, $1,700 Western Union transfer. And with respect to jurisdiction for count four, that was a money laundering count. Now, unlike many statutes, the money laundering provision has a specific provision with respect to extraterritorial application. And the Supreme Court has made clear on a number of occasions, including in its recent Morrison case, that the extraterritorial reach of the statute depends on Congress's intent. And here we have a very clear indication of Congress's intent. 1956F says, there is extraterritorial jurisdiction over the conduct prohibited by this section if, and they say, in the case of a non-U.S. person, which Mr. Kwok was a non-U.S. person, part of the conduct must have occurred in the U.S. Well, the government says part of the conduct occurred here. He caused the Western Union transfer, which eventually arised here. So even taking as true that that was some small part of Mr. Kwok's conduct occurred in the U.S., that only is the first part of the two requirements of 1956F. The other part is that the transaction or series of transactions would be $10,000 or more. That was not established here. And the government says, well, that second requirement doesn't count because there are sort of general territorial jurisdiction cases in other contexts that say if some of the conduct occurred in the U.S., there's extraterritorial jurisdiction. Well, that may be true in other cases where Congress hasn't clearly indicated its intent and the court has sort of had to construe, based on all the factors, whether or not this is a type of offense that there should be extraterritorial jurisdiction and that sort of thing. But the fact that alone that some conduct occurred here cannot be the be-all, end-all because 1956F requires that some of the conduct occurred here and that the transaction or series of transactions be over $10,000. Moreover, in the recent Morrison case, the Supreme Court dealt with the situation. How many counts does the extraterritorial provision apply to? Just count four. Just count four. Yes. And moreover, as the Supreme Court recently said in Morrison, in that case the government said, well, look, this is a criminal statute, but it was being enforced in a civil context. And the government said, look, some of the conduct here occurred in the U.S. The Supreme Court said it doesn't matter. When you look at all of the circumstances, we believe Congress's intent was not to provide jurisdiction over this type of conduct.     And so we believe that the Supreme Court's intent was not to provide jurisdiction over this type of conduct. Now, here, again, 1956F is a lot more clear. Part of the conduct's got to be here, and there's the $10,000 threshold, which wasn't met and couldn't have been met by the government. Would you turn to the count three problems? Sure, Your Honor. And there are three issues raised with respect to count three. I'll focus on what I believe, given the government's reply brief, is the strongest, which is this. The government relied on count three on a regulation that grew out of the Arms Export Control Act, Section 2278, which I believe is really inscrutable. And I argued before trial, including in a motion to dismiss, that I believe that the government was required to show that the defendant was a U.S. person. Mr. Clark was not a U.S. person. They couldn't make that showing, so the charge didn't work. The government countered in its pretrial motion opposition, no, what we have to show is that the item involved is a U.S. origin item. I disagreed with that. That was what the government argued. Judge Benitez denied my motion to dismiss. I believe I re-raised this issue also to some degree in the jury instruction request, but nevertheless. This is the question as to whether the encryptor was made by General Dynamics? Well, whether or not the encryptor itself was of U.S. origin. Right. And this is going to be a plain error issue, isn't it? Well, I don't believe it's a plain error issue because I think that Ordunia Aguilera indicates this is an element of the offense. And Ordunia Aguilera indicates the general sufficiency objection preserves the issue. It's on an element. Moreover, it can't really be said. But you haven't raised this. You've not discussed this at all with the district court. Well, I would say. Did you raise this at trial? Did I specifically say the government has improved it post-trial? No. And I think the general sufficiency issue preserves it. Okay. But the idea that I. . . You didn't raise it, but you want to argue that there's other law that allows you to avoid what would otherwise be a plain error argument. I guess that's one way of putting it, yes, Your Honor. I would say that a general sufficiency preserves it. I don't have to go through every potential issue. And I think, as you can see from my briefs, there were many potential issues. I didn't list all of those post-trial. But, you know, as far as did I sandbag, I don't think I sandbagged at all. I made clear my position with you as persons. Would you mind turning to the 18 U.S.C. Section 2 argument that you made, the question of grafting the causation statute onto the. . . Sure, Your Honor. . . . onto the substantive offense. The government charged in the indictment aiding and abetting the buying offense. And they. . . No, I'm sorry. This is also the count three. This is also in the Arms Export Control Act context. They argued aiding and abetting the attempt to export a defense article. And I pointed out some case law didn't allow for an aiding and abetting an attempt to export, because the person that was involved that would have actually attempted was the case agent, and he had no intent to export the article. Government, in response, said, well, look, our theory is actually that Mr. Kwok attempted to cause, under Section 2B rather than Section 2A, which is the aiding and abetting provision, he attempted to cause the agent to export the item. But Subsection 2B doesn't apply to attempting to cause someone to do something. It applies to causing someone to do something. And it is already an attenuated sort of version of principal liability, and certainly if Congress wanted to add an attempt in there, it would have done so. And what the government says, well, the regulation allows for an attempt. And so we can just take the fact that the attempt is in the regulation and sort of import it into Subsection 2B and create an attempt to cause offense. And my first problem with that is, of course, that's not the theory on which the grand jury indicted. The grand jury presumably indicted on aiding and abetting. That's what the indictment said. And there was certainly nothing in the specific wording of the indictment that gave any indication that the grand jury indicted on this 2B, you know, Subsection 2B attempt theory. But furthermore, it's just not a theory that Congress has allowed in expanding liability. And it makes perfect sense that Congress wouldn't allow it. It's already allowing attenuated liability. And then to put an attempt on top of it, when normally Congress specifically requires an attempt provision, there's a good argument why it wouldn't do it. So it's not like this is an absurd construction in the statute that I'm arguing for. The last item that I'd like to touch on is with respect to Count 2, which is the by prior to exportation, knowing that an item is intended for exportation in violation of law. As I argued to the district court, there's got to be some showing that someone intended to export the item. It says knowing the item is intended to be exported. It doesn't say believing, like some other statutes. It says knowing. And the logical person here would have to be the case agent. He was going to be the one that is supposedly, under this rule, is going to export the item. But, of course, he didn't intend to export the item. He had no intent to do that whatsoever. Mr. Kwok didn't intend to export the item. He might have hoped that the case agent would export it, believed that the case agent would export it. But certainly no one here intended to export it. So it seems to me in the jury instruction I requested was, look, the government has to show that the case agent intended to export the item. Because he was the one, if anyone was going to export it, that was going to do it. You make a great distinction between an attempt to export and an attempt to cause an export. Yes. With respect to the last issue I discussed, that they're already relying on 2V to get sort of an attenuated principle liability, and they're trying to add an attempt as well to that. You know, I think with respect to all of the substantive counts, there are real problems. Whether or not those problems bleed over into the conspiracy count is a more difficult question. But the duress thing to me, you know, obviously this isn't a personal issue. This is a legal issue. But to me was really, when I look at what this man experienced, to not allow him to present that to a jury and have a jury, the traditional decider, look, is this hokum or is this for real, to preclude that was really an injustice. Is there any more questions? No. We're going to take a five-minute break. May it please the Court. Peter Ko from the United States. I'm going to start with the duress issue. Obviously, we believe the duress offense was correctly excluded by the district court. I think it's important to remember or recognize that what the defense is seeking here is really a pretty significant expansion of duress law. In fact, it's really unprecedented. They're claiming that Mr. Kwok was under duress for seven years, and certainly the three-and-a-half years that span the charged criminal conduct. As far as I'm aware, I have not found any case that has allowed a duress defense to go forward where the defendant claimed to even be under duress for six months, much less three-and-a-half years or seven years. I think the reason is because of what duress is when properly conceived. It's an emergent situation where somebody has threatened you or your family, and there's literally no opportunity to pursue legal alternatives. There's no opportunity to go to police. You simply have to commit the crime or you're going to be killed or your family is going to be killed. Are you asking us then to hold that as a matter of law? You can't have something beyond six months? No, I'm not saying that. I think it depends entirely on the circumstances of the case. If it depends on the circumstances of the case, why isn't that a matter for the jury? Because in this case, what you have is a situation where The answer that it depends on the circumstances of the case is usually one that gets decided as a matter of fact, not as a matter of law. So what principle of law do you have here that would preclude this guy from even being able to say I was under duress? It's the definition of immediacy. This Court has defined immediacy as present, immediate, impending, such that the defendant's persecutors figuratively held a gun to the defendant's head. That's what this Court said. The gun to the head is, of course, sort of a classic example. But in a case in which he alleges, and so for purposes of this motion, we have to be able to presume that he's going to be able to prove this, right? I think we have to assume that he's going to be able to prove the things that he claims, that is, that these in fact were Chinese government agents. I think there's reason to question whether they were. But for this purposes, we're going to assume that they were, and that they've got information about his wife, that they have personal information about him, phone numbers, birthdates, they know about sickness and so on, things that he didn't tell them, and that they are evidently shadowing him, and that they have told him that they will do things to his wife and son and him if he does not cooperate with them. Correct. All of those things are things that he alleged. Well, what he did not claim was that he was, somebody was there presently all the time to enforce these threats. He never claimed that when he was in his home, there were people there. He never claimed that he saw people outside of his home. He never claimed that there were people in his business when he was there. He never claimed that he saw people outside of his home. Again, all of those are reasons to, that you would want to present to a jury as to why you don't think that he was under duress. But what gives us the right to decide this as a matter of law if he says, look, they didn't want me to do something, they weren't just pressuring me to do something right now with a gun to the head scenario. But this is something in which they said, we've got you on the line. And we may need you in a couple of weeks. And in a couple of weeks, we're going to come and we're going to do something and we're going to hurt your wife if you don't do what we want you to do. In a situation where he may be able to get out of Macau, not clear that he can get the wife and the kid out. And this comes up quite often. You know, we hear about what goes on in China in immigration cases all the time. And people that make their way over to Tinian, and they're living in virtual slavery, trying to work off a $10,000 debt. And they're told, you better stay here, or we know where your family is. I mean, because they had them all sign notes and everything else. And if you don't keep working and send us the money, we're going to kill them. We hear that. I mean, it's just nothing new. I mean, you're talking about duress. I think when it was set up, you know, you're thinking about a situation, a place like America where, you know, there's this problem and you can go to the authorities and say, look, this is my situation. Now help me. I'm not disputing that there can be a general fear of harm, but this Court has said that's not enough. It has to be a specific, immediate threat. And to answer the question you were posing, I think... But the threat is there all the time. There's a general threat, but I still think the threat has to be immediate. This Court said in Burkino v. United States, which was the World War II treason... You know we're going to kill you. Exactly. And this is going to run the rest of your life. So you've got to listen to what we say. You've got to do it. If you don't do it, your family is hostage. We're going to kill them. Yes, but this Court still said in Burkino v. United States that the immediacy requirement applies even when you're in a foreign country, the threat is by a foreign government, and the U.S. government is not capable of helping you. That's the law. That's a little crazy, isn't it? It's your decision. NYSERDA's decision. So that's the standard. I mean, the immediacy requirement still applies. There is no... I don't think it's necessarily crazy. I mean, the immediacy requirement is there to narrow this down to situations where it is genuinely a duress situation where you're committing the crime because there's really an emergency situation. And to answer the initial question by Judge Ivey, I think the reason why this does not go to a jury is because this Court has established through its case law as a matter of law, if you're alone in the apartment and there's nobody there to enforce the threat, that's not an immediate threat. You know, that's... I think that's a perfectly good argument, and maybe a good argument as a matter of law if all you're concerned about is your own life. When you've got... when you have... when somebody is threatening to kill your family and it's not clear that he can get them out of Macau, I mean, I suspect that if we let you... if we let the two of you litigate over this, this is going to be a big fight over whether reasonably get his wife and his kid out of Macau. If we find out that they've been vacationing in Bali, you know, the duress defense is going to collapse very quickly. But where only he is traveling in and out of Macau and wife and baby are still there, that may present a different situation. Potentially, yes. But I think that goes more to the reasonable opportunity to escape. It still goes... there's still an issue about the immediacy of the threat. And the immediacy of the threat is where I think they clearly fall short in this case because you have a situation, U.S. v. Shapiro, where the persecutors were parked outside of the house. And this court said, that's not enough. That's not an immediate threat. You have a case like U.S. v. I believe it's Gordon, in which they said, you were left alone for four and a half hours and you're parking. Do you have any cases in which what we've got is a threat to somebody else? Somebody else other than the person that's perpetrating the crime? There are cases in which there are threats to other people, yes. And what do we say in those cases? Well, one of them is U.S. v. Otis, which is the case that Mr. Burns mentioned earlier. But Otis I don't think is terribly helpful because all it says is that the jury could have concluded the threat would be enforced immediately. It doesn't describe any of the underlying facts that give rise to... So Otis is ambiguous, so we don't really have a case that involves threats to others. It may be a novel question, then. Yes, I agree. So I believe where they fall short most clearly is on the immediacy of the threat, but they also fall short on the lack of a reasonable opportunity to escape. Because this Court has said repeatedly that if you have an opportunity to notify law enforcement about your plight, that's a reasonable opportunity to escape. And in this case, we have a defendant who claimed, swore, I knew I was dealing with U.S. law enforcement. And he was in daily contact with them. He was talking to them over email, text messages, instant messaging, video conferences, phone calls. He never said boo. He didn't say anything. He got on the plane. He didn't claim he thought he was being followed on the plane. He never said anything on the plane. He didn't say anything on the customs forms when he was landing at the airport. He didn't say anything until he was 30, 45 minutes into his post-arrest interview and it had already been made clear you're under arrest, you've been caught. And that's the first time, according to them, when he tries to say, I was under arrest. He had plenty of opportunities before that. So based on that, the district court was correct as well to exclude the duress defense. Well, I see you're making a good jury argument. I think I'm also making a good argument as a point of law. I think the court is very clear that the immediacy of the threat is there has to be somebody there at all times to enforce the threat because otherwise you have an opportunity to pick up the phone and call the cops or you have an opportunity to walk away and try to walk away. Who was he supposed to call? Well, according to him, he believed he was in contact with U.S. law enforcement for some undetermined time. He could have called them up and said, hey, or told them in any one of his instant messaging sessions, any one of his e-mails, any one of his video conferences, I'm under duress, my family has been threatened, I need your help. And at that point, who knows what happens. But it's on him to say that if he has the opportunity. It's unlikely that the marshals parachute into Macau and get him out. Well, I don't think they're going to parachute in, but I don't think we can dismiss entirely the ability of the United States to help people in foreign countries. We've got those nice businessmen. I'm sorry? We've got those nice businessmen. Oh. They're great. Aren't you making a good factual argument? I don't think it's limited to a factual argument. I think this is a legal argument. I think this court has established that when there are opportunities and you are left alone, you are not under surveillance. There is not somebody there at all times to enforce the threat. That is not an immediate threat. I think that's consistent with this Court's decisions. It's consistent with the decisions by other courts as well. The Eleventh Circuit said ordinarily somebody has to be present at all times to enforce a threat. It's consistent with the decisions by the Seventh Circuit in which they rejected a claim that the defendant was under duress. This is in Sawyer for a year because they said there was no claim that the defendant was under surveillance at all times during this year-long period in which he was engaged in the meth ring. So I think this is a matter of law. What this Court has established is there has to be somebody there to enforce the threat at all times. It can't be this general fear that, oh, I think, maybe rightly so, I could be harmed in the future if I don't do this. There has to be somebody there because that's what creates the emergency situation. If there are no more questions on this point, I'll go ahead and move to some of the other arguments that have been raised. Turning to the extraterritorial jurisdiction point 1956F, I think this is putting the cart before the horse. The statute reads there is extraterritorial jurisdiction. But before you even get to that, you still have to answer the question, are we seeking to apply a statute territorially or are we seeking to apply it extraterritorially? And in this circuit and in the Supreme Court, in the criminal context, those terms have very settled meanings. If part of the criminal conduct occurs in the United States, the statute is being applied territorially. If it's entirely outside the United States, all the criminal conduct, that's when the statute is being applied extraterritorially. I don't think this Court ever gets to 1956F because this is a statute that's being applied territorially. I'm sorry. 1956 is being applied territorially? Yes. 1956, the money laundering count and count for 1956A2A is being applied territorially. What conduct did Mr. Kwok conduct inside the United States? He sent the wire transfer into the United States. And this Court has held, and other courts have held as well, that a wire transfer occurs both where it is sent and where it is received. And, in fact, I believe there's even a venue statute in 1956. I can't recall it off the top of my head. I think it's 1956I, which indicates that as well, that the conduct occurs in the United States if the transfer is sent. What would be an example, then, of how F would apply, of where F would apply? I think F was meant for situations where everything occurred outside the United States. And I acknowledge it's difficult to read that because of that one provision that says part. Any case where F has been applied? No. There's no case like this. We were not able to find it. Give me an example of what it would look like. I think 1956F envisions a foreign person involved in foreign financial transactions, say, you know, pick two countries outside of the United States, possibly even involving violations of foreign law because I think 1956A1 is broad enough to read that. And on that basis is when 1956F occurs or kicks into play because now you're talking about extraterritorial jurisdiction. Everything has occurred outside the United States. And yet the statute is broad enough to reach that. I have to say that's an extraordinary reading of that statute. Which reading? Well, your reading of when extraterritorial applies, what it means to have an extraterritorial act. I don't think so. I think it's very clear, at least up until the point you get to 1956F, this court has repeated itself. It's a little strange, counsel, because F1 specifically contemplates that in the case of a non-United States citizen, the conduct occurs in part in the United States, which means then that the fact that F doesn't apply. Under your theory, F just did away with itself. It's self-destructive. And I was actually going to allude to that earlier. Maybe you should do more than allude. I'd like to see how it works. I agree. I think that is a difficulty with reading the statute. That suggests that that's a crummy reading of that statute, doesn't it? I don't think so necessarily because you still have a case where territorial and extraterritorial have settled meanings in the criminal context. Okay. But in the case of a non-United States citizen, the conduct must occur in part in the United States, and that is part of what's defined as extraterritorial jurisdiction. I don't think they define Under your definition, we don't ever get to that, and F is utterly meaningless. No, F is not utterly meaningless because there's other clauses to it, but it's utterly meaningless in that situation because I think this is a situation where a literal reading of the statute makes no sense. Counsel, if we disagree with you on your reading of F and F1, you get past F2. The $10,000 limit? Right. No. No.  So the government concedes that you don't have proof of $10,000. So if we disagree with your reading on F1, you're going to lose on this one. Yes. Okay. All right. Turning then to I'll go to the 2B argument if the Court is okay with that. We are not importing an attempt clause into 2B. The attempt provision comes from the regulation 127. No, but you are importing the causation clause from 2B. Into the regulation.  Yes. That's what we are doing. And that applies universally. You can cause an attempt. Can you attempt to cause? That's what we are claiming, yes. You can attempt to cause. Well, that's an interesting reading. I don't think it's that unprecedented. You have a statute 2B that basically makes exporting and causing the export legally equivalent. That's what it does. It says if you willfully cause the export. Or the attempt. Or the attempt. Because the regulation punishes both the act of exporting and an attempt at exporting. Right. So if you cause the export or if you cause the attempt to export, then you will have violated the combination of 18 U.S.C. 22B and whatever it was, 22, 272. 27.1. Yeah. I'm sorry, the CFR provision. Yes. Okay. So how did you show here that Mr. Kwok caused an attempt to export? No. That was not our theory. Our theory was that he attempted to cause the export. Okay. But how do you get to graph that around and have an attempted cause? Because that would suggest that 2B ought to have whoever willfully causes an act to be done or attempts to cause an act to be done. And you don't have an attempt provision in 2B. We're not getting the attempt provision from 2B. I know, but you have to cause a criminal act. That's what 2B says. If you cause a criminal act to be done by somebody else, you're liable as if you were the principal. The act here is the attempt to export, which comes out of the CFR provision. Right. So you have to cause an attempt. And you flip that around. Yes, we flip it around in the sense that what we said is you're also exporting and causing the export are the same thing. That's what 2B stands for, willfully causing the export. That's true, but you don't have an export. All you have is an attempt to export. So causing an attempt to export is the same as attempting to export under your same logic. Well, but the statute doesn't read just attempt. It reads attempted export. So if you substitute cause export for export, you have an attempt to cause the export. And that's basically what the Eighth Circuit reached in May. Yes, we've adopted a principle. There's a general principle that unless Congress punishes the attempt, that we don't have a general attempt provision in the Federal Code. We're not claiming there's a general attempt. Your attempt provision comes out of the CFR provision. So all you can do is cause an attempt. You can't have an attempt to cause because then you're grafting the attempt provision into 2B, which you can't do. No, we're grafting it the other way. I see what the Court's point is. I respectfully disagree. I believe the Eighth Circuit in May upheld exactly this situation in which they said the claim was basically the government has charged attempt to cause the destruction of records, and that's not a crime, and the Eighth Circuit rejected it based on the fact that 2B combines with the destruction of government property statute, which I think was 2071. And on that basis, yes, you can charge attempt to cause the offense. So I respectfully disagree, but I understand you have the final say, not I. Thank you. Final one last point on the intended to export, which I think was the challenge to 18 U.S.C. 554. I think it's significant in the statute that the wording is passive. It says, knowing the same 2B intended for export, just by virtue of the passive voice, which is pretty significant in criminal statute. Most statutes would say if they meant it to be attributed to the defendant or somebody specific, they would say knowing the same was intended for buying the item, knowing it was intended for exportation or intending to export it, something along those lines. But when they make it passive like that and they say knowing the same 2B intended for export, this is a situation where I don't think it meant the intent to be attributable to any specific person. They just wanted to freeze it in time and say did you buy it knowing the item was intended at that moment for export unlawfully. I'm out of time. So unless the Court wants me to address anything specific, I'll dismiss it. Go ahead and finish your thought. That was the end of it. We believe the conviction and sentence should be affirmed. All right. I think you've used up your time, too. Okay. 30 seconds. A couple of things. No, not a couple, but 30 seconds. Okay. Dequino, which Government Counsel mentioned, is a case that covered a two-year time span. It's a person that wasn't being monitored. You know, she was accused of committing treason while in Japan. She was getting paid a salary. She was free to apparently refuse to come to work. She clearly is not being constantly monitored. Otis doesn't seem to me to be ambiguous with respect to the fact that they say this guy is in the United States, not being monitored. His dad is back in Columbia, subject to second kidnapping. Contento Pachon, same situation. They talk about how he's been told that his family is being monitored, where he lives. They know his wife and child's name, et cetera. So I don't think there's ambiguity in that. And I think I'm out of time. Okay. Thanks. And all matters on this calendar are now submitted. And we will recess until tomorrow morning at 9 o'clock. Thank you. Thank you, gentlemen. Thank you. This corporate session is now adjourned.
judges: Davidson, Pregerson, Bybee